IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH

| | | |
|---|---|---|
| BETH SCHIRNHOFER, | ) | |
| | ) | |
| Plaintiff, | ) | 2:16-CV-00462-CRE |
| | ) | |
| vs. | ) | |
| | ) | |
| PREMIER COMP SOLUTIONS, LLC, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| | ) | |

## MEMORANDUM OPINION

CYNTHIA REED EDDY, United States Magistrate Judge.

Presently pending before the court is the motion for summary judgment filed by

Defendant Premier Comp Solutions, LLC ("PCS"). (ECF No. 45). For the reasons that follow,

the motion will be granted as to Ms. Schirnhofer's Family Medical Leave Act claims against

PSC and otherwise denied.[1]

This action was removed from state court to federal court on April 19, 2016. (ECF No.1).

Beth Schirnhofer ("Ms. Schirnhofer" or "Plaintiff") filed her first amended complaint ("FAC")

on June 16, 2016. (ECF No. 8). In her FAC, Ms. Schirnhofer alleges that PCS, her former

employer, subjected her to discrimination and retaliation in violation of the Family and Medical

Leave Act ("FMLA"), as amended, 29 U.S.C. § 2601 *et seq.*, the Americans with Disabilities Act

("ADA"), as amended, 42 U.S.C. § 12101 *et seq.*; the Pennsylvania Human Relations Act

---

[1] The parties have consented to jurisdiction by a magistrate judge. (ECF Nos. 15, 16).
Under the Federal Magistrate Judges Act, "[u]pon consent of the parties, a full-time United
States magistrate judge...may conduct any or all proceedings in a jury or nonjury civil matter and
order the entry of judgment in the case, when specially designated to exercise such jurisdiction
by the district court." 28 U.S.C. § 636(c)(1). Consent of all parties to a case gives the magistrate
judge full "authority over dispositive motions, conduct of trial, and entry of final judgment, all
without district court review." Roell v. Withrow, 538 U.S. 580, 585 (2003).

("PHRA"), 43 P.S. § 951 *et seq.*, and the Allegheny County Nondiscrimination Ordinance ("ACHRA"), Code of Ordinances, § 215-30 *et seq*. Ms. Schirnhofer alleges that PCS denied her request for reasonable accommodation, interfered with her right to take medical leave, and terminated her because; (1) she is disabled or was perceived by PCS to be disabled; (2) she sought accommodation for her disability; and (3) she sought medical leave for her own serious health condition. The court has jurisdiction over Ms. Schirnhofer's federal law claims pursuant to 28 U.S.C. § 1331 and her state law claims pursuant to 28 U.S.C. § 1367.

Fact discovery ended on March 15, 2017. (ECF No. 31). PCS filed its motion for summary judgment on June 15, 2017, along with a brief in support, concise statement of material facts, and appendix of exhibits. (ECF Nos. 45-48). On August 18, 2017, Ms. Schirnhofer filed a brief in opposition, concise statement of material facts, response to defendant's concise statement of material facts, and appendix of exhibits. (ECF Nos. 55, 57-59). On September 18, 2017, PCS filed a reply brief, a reply to plaintiff's response to its concise statement of material facts, a response to plaintiff's concise statement of materials facts, a supplemental concise statement of material facts, and a supplemental appendix of exhibits. (ECF Nos. 66-70). On October 10, 2017, Ms. Schirnhofer filed a sur-reply brief, a response to defendant's supplemental concise statement of material facts, a supplemental appendix of exhibits, a motion to strike PCS's reply to plaintiff's response to defendant's concise statement of material facts and a supporting brief. (ECF Nos. 74-78). On October 23, 2017, PCS filed a sur-surreply brief. (ECF No. 82). On October 24, 2017, the court issued a Memorandum Order denying Ms. Schirnhofer's motion to strike and stating that it would "take into consideration all of the parties' submissions in determining the pending motion for summary judgment." (ECF No. 84 at 2). The matter thus is fully briefed and ripe for disposition. (Id.).

## I. Statement of the Facts[2]

### A. Ms. Schirnhofer's mental impairment and mental health treatment

Ms. Schirnhofer reported being treated for mental health issues episodically since she was about ten years old. (ECF No. 48-1 at 40). She was not sure exactly why the treatment started then but recalled having a reoccurring nightmare. (Id.).

Ms. Schirnhofer began her employment with PCS as a billing assistant in its billing department in January 2009. (ECF No. 48-1 at 38). Beginning in May, 2010, Ms. Schirnhofer was having panic attacks and sought mental health treatment from Jefferson Regional Medical Center ("Jefferson"). (ECF No. 58-3). Ms. Schirnhofer's treating therapist at Jefferson originally was Robert McElhose, Ph.D. ("Dr. McElhose"), a psychologist. (ECF No. 58-2 at 5). Dr. McElhose did an initial intake assessment of Ms. Schirnhofer on May 17, 2010. (Id.). Based upon Ms. Schirnhofer's personal history[3] and current anxiety, Dr. McElhose diagnosed Ms. Schirnhofer as suffering from Post-Traumatic Stress Disorder ("PTSD"). (Id. at 9).

Ms. Schirnhofer's treating psychiatrist at Jefferson was Dennis Wayne, M.D. ("Dr. Wayne"). Dr. Wayne did a psychiatric evaluation of Ms. Schirnhofer on July 19, 2010 and his diagnoses for Ms. Schirnhofer were bipolar, attention deficit disorder ("ADD"), PTSD, and generalized anxiety disorder ("GAD"). (ECF No. 48-4 at 6). His diagnoses were based upon Ms. Schirnhofer's personal history and symptoms, which included nightmares, night terrors, anxiety and panic attacks. (ECF Nos. 48-5 at 6-7; 58-6 at 8). Dr. Wayne opined that Ms. Schirnhofer's PTSD was significant, chronic, and ongoing. (ECF No. 58-6 at 8).

---

[2]      This section reviews the facts relevant to PCS's motion for summary judgment.

[3]      The details of Plaintiff's personal history are the subject of a protective order entered by this court and are not determinative of the presently pending motion for summary judgment. Therefore, these details are intentionally omitted from this opinion.

Dr. McElhose treated Ms. Schirnhofer as a patient until May 2013 when Ms. Schirnhofer had an aggressive outburst during one of their therapy sessions. (ECF No. 58-2 at 14). As a result of the outburst, Dr. McElhose opined that he could not treat Ms. Schirnhofer and referred her to Timothy Brodkorb ("Mr. Brodkorb"), a licensed clinical social worker, for continued therapy. (Id.).

Ms. Schirnhofer began treating with Mr. Brodkorb in June, 2013. (ECF No. 48-4 at 5). Mr. Brodkorb did not do a specific assessment of Ms. Schirnhofer after he took over treatment for purposes of confirming that she had PTSD or GAD. (Id. at 9).

From a mental health standpoint, Ms. Schirnhofer's health remained essentially static until 2012. (ECF No. 58-1 at 4). Beginning in 2012, her mental health began to deteriorate. (Id.). The triggering events were that Ms. Schirnhofer's newborn grandson died and a co-worker to whom Ms. Schirnhofer was close left PCS. (Id.). She began to suffer from hyper-vigilance, paranoia, pervasive anxiety with panic attacks, and feelings of isolation. (Id.). Her work-related stressors continued during 2013, which included conflicts with co-workers and PCS changing some of its policies. (Id.).

Ms. Schirnhofer's behavior and problems with interacting and communicating with her co-workers were discussed amongst PCS management. Linda Schmac ("Ms. Schmac"), the President of PCS, testified at her deposition that Ms. Schirnhofer "complained about everything. She complained about [co-workers] talking. . . . [J]ust the fact that if she could hear their voice, she complained about." (ECF 58-26 at 8). Ms. Schmac stated: "when people whispered, she thought they were talking about her." (ECF No. 58-26 at 3). Additionally, "she got loud and she would get in fights with people." (Id. at 4). "[T]hey didn't include her in a birthday celebration so that was another complaint." (Id.). "She took pictures with her cell phone of people talking

and would e-mail them to my husband or a scarecrow dropped off of her cubical onto her keyboard and she takes a photo of it and e-mails it to my husband." (Id.). With respect to Ms. Schirnhofer complaining about a co-worker who had talked about holding a baby, Ms. Schmac stated in a January 10, 2014 email to her husband Don Schmac, a member of PCS's management team, and Jennifer Snyder, PCS's human resources person, "Beth is beyond sensitive," "[i]f it bothers Beth, she's going to have to seek medical attention for her issue because we're not going to tell our entire staff not to talk about babies because Beth lost a grandchild. . . . No normal person, me included, who has lost a child would expect th[a]t everyone they work with to completely stop talking about babies or children. So that's just unreasonable for her to expect." (ECF No. 58-17 at 4-5). Ms. Schmac summarized Ms. Schirnhofer's complaints as being "oddities" and that Ms. Schirnhofer "was just a complainer. It was a hater type of person. (ECF No. 58-26 at 6-7).

Ms. Schmac's January 10, 2014 email was in response to Ms. Snyder's January 9, 2014 email to Ms. Schmac and Mr. Schmac wherein she explained: "Beth doesn't chitchat with anyone[;] she easily takes offence [sic.] to the fact that others have relationships with one another and chitchat throughout the day. Beth also needs to realize that we will not require that employees sensor everything they say in order to avoid saying something that is going to strike a chord with another employee. Beth is correct that every employee has their own issues and stresses. Apparently Beth puts all of hers out there and expects the others to tiptoe around any subjects that might relate to her own stresses." (ECF No. 58-17 at 6).

On January 16, 2014, Karen Gillooly ("Ms. Gillooly"), Ms. Schirnhofer's direct supervisor, sent an email to Mr. Schmac concerning Schirnhofer's performance review for 2013 in which Ms. Gillooly stated: "This is a hard review because she is such a good worker but the

personal issues are starting to overshadow the good job she does especially when it affects others in the department." (ECF No. 58-18 at 3). On February 4, 2014, Mr. Schmac responded to Ms. Gillooly via email about Ms. Schirnhofer's annual review, and included Ms. Snyder, in the email. He stated: "Karen, . . . As you state, Beth does a very good job on her tasks, she just needs to improve her communication with others in the office." (ECF 58-18 at 2). In the same email he stated: "Jen, [p]lease help Karen state Beth's relationship issues a little better in the review." . . . "I wanted to put in there something to the effect that . . . 'Beth should also feel comfortable asking a co-worker what they are saying if she feels they are being disrespectful towards her'." (Id.).

On February 5, 2014, Ms. Gillooly sent an email to Mr. Schmac. (ECF No. 58-22 at 2). The "Subject" was "BETH." (Id.). In the email she explained that Beth had complained to her about Melissa Gozner ("Ms. Gozner"), a co-worker in the billing department with whom Ms. Schirnhofer did not get along, told Ms. Snyder that "she works with a bunch of haters," and she mentioned that Annie and Ms. Gozner were whispering. (Id.). In response, Ms. Snyder questioned Ms. Gozner, who told her that the reason they whisper is so they do not upset Ms. Schirnhofer. (Id.).

Ms. Schirnhofer's annual performance reviews also showed how Ms. Schirnhofer's behavior changed in terms of her interacting and communicating with her co-workers. (ECF No. 58-7). One of the categories in which Ms. Schirnhofer was reviewed yearly was "Working Relationships," defined as "[c]ooperation and ability to work with supervisor, co-workers, and clients served." (Id.). In her 2009 Employee Performance Evaluation, with respect to "Working Relationships," Karen Gillooly stated in pertinent part: "Beth's working relationship with her co-workers and other employees meets expectations the majority of the time. Although there was a

problem earlier in the year with her working relationship with a co-worker this has improved and has ceased to be a problem. Beth is cooperative and readily accepts direction. I have received positive feedback from her co-workers." (ECF No. 58-7 at 2). In Ms. Schirnhofer's 2010 Employee Performance Evaluation, with respect to "Working Relationships," Ms. Gillooly stated: "Beth's working relationships with her manager and co-workers meets expectations. Beth works well with others in the department and is willing to assist others when needed." (ECF No. 58-7 at 4). In Ms. Schirnhofer's 2011 Employee Performance Evaluation, with respect to "Working Relationships," Ms. Gillooly stated: "Beth's working relationships with her co-workers meets expectations. She has demonstrated the ability to work with others in her department including her manager to recognize and resolve issues concerning her work." (ECF No. 58-7 at 6). In Ms. Schirnhofer's 2012 Employee Performance Evaluation, with respect to "Working Relationships," Ms. Gillooly stated: "Beth's working relationships meets expectations. Beth has established a good working relationship with our contracted providers. She is willing to help others in the department. Issues and concerns are typically brought to her manager's attention however, there have been occasions where has Beth [sic.] voiced frustrations with other employees in the office. Beth should focus on communicating her concerns and issues with her manager so they can be addressed." (ECF No. 58-7 at 8). Ms. Schirnhofer was fired from PCS on February 5, 2014, before she received her 2013 performance review but it can be reasonably inferred from the emails between PCS management, it would have referenced her problems with her co-workers. (ECF No. 58-18 at 3).

**B. The beginning of the end of Ms. Schirnhofer's employment with PCS**

On November 27, 2013, Ms. Schirnhofer got into an argument with Ms. Gozner. (ECF No. 46 at 4, ¶ 24). This was not the first conflict between the two employees. As a result of the

November 27 argument, Ms. Schirnhofer, Ms. Gozner, and others in the billing department who witnessed the argument had to meet with Ms. Snyder of PCS's human resources department. (ECF No. 46 at 4, ¶ 26). Ms. Schirnhofer met with Ms. Snyder on December 3, 2013. (ECF No. 46 at 4, ¶ 27). Ms. Snyder was relatively new to the company in December, 2013. During her investigation of the incident between Ms. Schirnhofer and Ms. Gozner, Ms. Snyder learned from Ms. Schirnhofer that Ms. Gillooly had been allowing Ms. Schirnhofer to take breaks in addition to those allowed pursuant to PCS's policy on hours of work, as needed. (ECF No. 58-28 at 5). Ms. Schirnhofer explained that the breaks were needed for a medical problem she had. (Id.). PCS's hours of work policy (the "PCS Work Hours Policy") required non-exempt employees like Ms. Schirnhofer to work Monday-Friday from 8:30 a.m. to 5:00 p.m. and allowed a ten-minute break in the morning and a ten-minute break in the afternoon as well as a thirty-minute lunch period any time between 11:30 a.m. and 2:00 p.m., as well as restroom and coffee breaks as needed.

On December 5, 2013, Ms. Schirnhofer told Ms. Snyder that she might be having a neck surgery upcoming, Ms. Snyder explained to Ms. Schirnhofer that she could use FMLA leave for the surgery, and Ms. Snyder gave Ms. Schirnhofer the necessary forms that needed to be completed by Ms. Schirnhofer and her treating physician. (ECF NO. 48-16 at 3-5). Ultimately, Ms. Schirnhofer never took FMLA leave or had neck surgery. (ECF No.48-1 at 46).

On December 6, 2013, both Ms. Schirnhofer and Ms. Gozner received a first occurrence disciplinary notice ("FOD") as a result of their November 27 argument. (ECF Nos. 48-12 at 2; 48-13 at 2). In issuing the FOD to Ms. Schirnhofer, Ms. Snyder explained to Ms. Schirnhofer: "[a]ll employees are held to the same standard pertaining [to] breaks and lunch periods. If an employee requires time above and beyond what the Hours of Work and Payday Policy No. 210

permit due to a medical condition, the employee needs [to] make an FMLA or accommodation request and supply the proper medical documentation to approve the additional time away from their work area." (ECF No. 48-12 at 3). In other words, Ms. Schirnhofer no longer was permitted to take additional breaks when needed other than to take a quick break to get coffee or use the bathroom as permitted by PCS Work Hours Policy.

In response to being told by Ms. Snyder that she would not be able to take additional breaks as needed on an informal basis, and that she needed to make an accommodation request and supply medical documentation in support of the request, Ms. Schirnhofer spoke to Mr. Brodkorb about her need to have breaks at work to deal with the stress she was feeling at work. (ECF No. 48-4 at 15). In response, Mr. Brodkorb wrote a letter to PCS, dated December 9, 2013 ("the December 9 letter") that stated in relevant part: "This letter is in reference to the documentation regarding our client, Beth Schirnhofer. She is currently being treated for an Anxiety Disorder.[4] We would request that you allow her to take 'time outs' or short breaks during her work day to assist with her coping appropriately with work stressors." (ECF No. 48-17 at 2). The signatories on the letter were listed as Mr. Brodkorb and Dr. Wayne, but originally the letter was only signed by Mr. Brodkorb. (ECF No. 48-17 at 2). Ultimately, Dr. Wayne also signed a copy of the letter which was sent to PCS. (ECF No. 58-14 at 2). Dr. Wayne explained that Ms. Schirnhofer "had shared with [Mr. Brodkorb] that she needed some time, as he described it, [to] take time-outs, short breaks, and he agreed with her, and he came to me and asked me if I'd sign off on this and – to help her out, and I said sure." (ECF No. 48-5 at 14).

Upon receipt of the December 9 letter, Ms. Snyder explained to Ms. Schirnhofer that more information was needed from her treatment providers for PCS to be able to determine

---

[4] At the time, PTSD was listed in the DSM-IV under the umbrella of anxiety disorders. (ECF No. 58-5 at 7).

whether or not to grant her request for additional breaks. (ECF No. 58-14 at 2). Ms. Snyder gave Ms. Schirnhofer a Certification of Health Condition and Accommodation form ("the Accommodation Form") and Ms. Schirnhofer gave the form to Mr. Brodkorb to complete.

On the Accommodation Form, Mr. Brodkorb explained that Ms. Schirnhofer's condition was "PTSD, Anxiety" and requested an adjustment to Ms. Schirnhofer's work schedule "of one additional 10-minute break for morning and another one in afternoon." (ECF No. 58-16 at 4). The Accommodation Form asked, "Is the employee unable to perform any of his/her job duties due to the condition?" Mr. Brodkorb marked "no." (Id. at 6-7). The next question read, "If yes, what major life activity is limited due to the condition described above?" (Id. at 6). Despite having answered the prior question, "no," Mr. Brodkorb answered "communicating with others" as the major life activity that was limited. (Id.). When asked at his deposition to explain why he answered the question about limited major life activities when he had answered "no" to the prior query, "[i]s the employee unable to perform any of his/her job duties due to the condition?," Mr. Brodkorb explained that he had answered the question to the best of his ability and that he opined Ms. Schirnhofer could only do her job with the accommodation sought after. (ECF No. 58-5 at 7-8). Mr. Brodkorb further explained that Ms. Schirnhofer had repeatedly asked him to answer this question by explaining that work stressors were changing her personality, but he answered the question as he did because he opined that he should be using one of the listed impairments. (ECF No. 48-4 at 25). Mr. Brodkorb also listed, in response to the instruction "list the essential functions of the job that the employee is unable to perform due to the condition," "communication with coworkers and/or supervisor at times." (ECF No. 58-16 at 5). Mr. Brodkorb did not recall discussing with Ms. Schirnhofer the number of, or the timing of, breaks Ms. Schirnhofer was permitted to take at PCS, although the Accommodation Form requests

"additional" breaks. (ECF Nos. citation; 48-4 at 15-16, 58-16 at 4). Dr. Wayne signed a copy of the Accommodation Form completed by Mr. Brodkorb. (ECF No. 58-16 at 7). PCS received both the Accommodation Form signed by Mr. Brodkorb and the Accommodation Form signed by Dr. Wayne on or about January 15, 2014. (ECF No. 48-26 at 2).

Based upon the documentation from Ms. Schirnhofer's mental health treatment providers that explained Ms. Schirnhofer needed an accommodation in the form of two 10-minute breaks, to enable her to be able to communicate with others at her job, Ms. Snyder opined: "I would consider being able to communicate with co-workers and the manager as an essential part of the job." (ECF No. 58-16 at 2). She also opined that the documentation showed a disability. (ECF No. 58-28 at 6).

Regardless of Ms. Snyder's opinion, by letter dated January 28, 2014, bearing Ms. Snyder's signature, PCS refused Ms. Schirnhofer's request for an accommodation in the form of two additional breaks. (ECF No. 48-2 at 2). The letter set out what PCS considered were the essential functions of Ms. Schirnhofer's job and stated, "[a]fter a careful review of your request, we have determined that we are unable to provide you with an accommodation at this time because it does not appear that you require any accommodation in order to perform the essential functions of your job." (ECF No. 48-26 at 3). The letter concluded: "[s]ince we are unable to accommodate you reasonably in your current job, if you wish to transfer to another position, please advise me of you[r] request to do so and we will notify you of position vacancies." (ECF No. 48-2 at 3). A PCS job description for a billing assistant dated May 19, 2009, four months after Ms. Schirnhofer was hired by PCS as a billing assistant, listed "[e]xcellent communication skills," as one of the qualifications needed for the job. (ECF No. 58-15 at 2). The decision maker for the denial of the requested accommodation was Ms. Schmac, (ECF No. 48-29 at 12).

On February 5, 2014, Ms. Schirnhofer approached Ms. Gillooly and told her about issues she was having with Ms. Gozner, the co-worker with whom she had the argument on November 27, 2013, and another co-worker, Anne; the co-workers had compared Ms. Schirnhofer to "Sybil." (ECF No. 58-22 at 2). As Ms. Schirnhofer understood the reference, Sybil was a character in a movie starring Sally Field, in which Field portrayed an individual who experienced a multiple personality disorder (now referred to as Dissociative Identity Disorder) and Ms. Schirnhofer equated Sybil as "a crazy person." (ECF Nos. 57 at 5, ¶ 29; 58-1 at 6, 68 at 8, ¶ 29, 70-1 at 65). "Sybil" is "an iconic representation of the stigma associated with mental health disorders." (ECF No. 58-1 at 5). At 12:43 p.m. on February 5, 2014, Ms. Gillooly emailed Mr. Schmac about the conversation she had with Ms. Schirnhofer earlier in the day, noted that she had asked Ms. Gozner about the "Sybil" comment, and Ms. Gozner explained that Anne had called Ms. Schirnhofer "Sybil.[5]" (Id.). In fact, Ms. Gozner had called Ms. Schirnhofer "Sybil" on more than one occasion. (ECF No. 58-29 at 8). At 1:59 p.m., Mr. Schmac forwarded Ms. Snyder's email to Ms. Schmac, and commented, "[h]ow about this crap? I have an e-mail drafted to [Ms. Gillooly] which I'll copy you on. After injury management it looks like billing is our next personnel project." (Id.). Ms. Schmac replied to Mr. Schmac by email at 2:10 p.m., "I think you need to let Beth go as she truly is Cybill (sic.)." (Id.).

At some point during the day on February 5, 2014, Ms. Gillooly learned from Ms. Gozner that Ms. Schirnhofer was posting on Facebook about haters and being bullied, but that the posts did not specifically mention work. (ECF No. 48-36 at 2). Ms. Gillooly informed Mr. Schmac about the Facebook posts. (Id.). Mr. Schmac told Ms. Schmac, who asked for the

---

[5]     Ann Veglia-Eisler, a co-worker of Schirnhofer in the PCS billing department, testified at her deposition that Ms. Gozner called Ms. Schirnhofer "Sybil" more than once. (ECF No. 58-29 at 8.)

Facebook posts to be printed out. (Id.). The posts were printed out and reviewed by Ms. Schmac.

(ECF No. 48-29 at 8. They read, in order:

    a.  (Monday, February 3, 2014) (Ms. Schirnhofer): "U do know science right….for example….'For every reaction there is a reaction';"

    b.  (Monday, February 3, 2014) (Ms. Schirnhofer): "Just because I don't talk all day I am pissy or crazy I don't get it – feeling confused;"

    c.  (Tuesday, February 4, 2014) (Ms. Schirnhofer): "What's sad is when you and your 6 year old baby girl are crying together in the morning trying to build strength to face the bullies of our days;"

    d.  (Tuesday, February 4, 2014) (Tania Komyanik ("Ms. Komyanik")): "Aww, hope you guy's day gets better;"

    e.  (Tuesday, February 4, 2014) (Ms. Schirnhofer): "Tania sometimes I wish I could go back to the old days and handle s*** the old way;"

    f.  (Tuesday, February 4, 2014) (Ms. Komyanik): "Ill come handle it, I need to relieve my anger some how. Ill put someone in their place quicker than they can ask who I am. Hope you have a better day. We gotta hang out soon;"

    g.  (Tuesday, February 4, 2014) (Ms. Schirnhofer): "I am the way I am cause I c what u do and I don't want any part of it. Got 99 plus problems and a bitch ain't one!!!;"

    h.  (Wednesday, February 5, 2014) (during her lunch hour at work) (Ms. Schirnhofer): "I understand now y ppl who r bullied commit suicide nobody sees it and turns a blind eye….fuck it the bullies win I am done trying to deal and get through it…I have no more strengt….fml;"

    i.  (Wednesday, February 5, 2014) (Ms. Komyanik): "[J]ust because you fight back doesn't mean your stooping to their level or acting like them, its standing up for yourself and saying enough is enough. This isn't the Beth I know or use to know. Oh fuck it let me take care of that shit. Nuff said."

(ECF No. 48-37 at 2-3). Upon reading the Facebook posts, three hours after she had referred to Ms. Schirnhofer as "Cybill," and told her husband he needed to fire Ms. Schirnhofer, Ms. Schmac called Ms. Schirnhofer into her office and fired her for posting messages on her Facebook page that Ms. Schmac deemed threatening, in violation of the PCS Social Media

Policy. The Social Media Policy states that "[i]nappropriate posting may include discriminatory remarks, harassment, and threats of violence or similar inappropriate or unlawful conduct." (ECF No. 35 at 3).

### C. Expert Witness Scott Tracy Ph.D.

Scott Tracy, Ph.D. ("Dr. Tracy") is the plaintiff's expert in this case. (ECF No. 58-1). He is an expert in mental disorders, trauma, and counseling. (ECF No. 58-1 at 2). Dr. Tracy reviewed Ms. Schirnhofer's mental health records from Jefferson and numerous depositions, interviewed Ms. Schirnhofer, and then wrote his expert report. (Id. at 6). In his expert report, Dr. Tracy reached seven opinions. (Id. at 5). "Opinion 2" stated: "Beth Schirnhofer suffered from PTSD and other anxiety disorders while employed by Premier Comp Solutions, LLC ('PCS'), and these disorders caused her to have a significantly decreased ability to interact effectively and communicate in the workplace as compared to the average person." (Id.). "Opinion 3" stated: "[a]s a result of her PTSD and other disorders, Beth Schirnhofer suffered episodes of emotional flooding while at work. During flooding episodes, persons with PTSD are overwhelmed; they have great difficulty thinking and communicating, and cannot problem solve or resolve conflict effectively." (Id.). "Opinion 4" stated: "[d]ue to her PTSD and anxiety, Beth Schirnhofer needed to be able to step away from the stressor or trigger, and to decompress, in order to restore her composure and concentration and be able to work. The workplace accommodation of two additional breaks per day, as needed, that was requested of PCS was appropriate and warranted given Beth Schirnhofer's PTSD and flooding symptoms." (Id.). Dr. Tracy also noted that a review of Ms. Schirnhofer's psychiatric records supported her historical report. (Id. at 6).

In his deposition, Dr. Tracy opined that Ms. Schirnhofer had, and still has, PTSD. (ECF No. 78-1 at 9). He opined that because of the nature of her childhood and early adult life

stressors, Ms. Schirnhofer will have PTSD for the rest of her life. (Id.). Dr. Tracy opined that Ms. Schirnhofer also suffers from GAD because of the cluster of symptoms that she has and that it is very common for an individual with PTSD to have a secondary behavioral health issue(s) like GAD. (Id.).

With respect to "Opinion Four" in his expert report, Dr. Tracy explained that Ms. Schirnhofer should have been given the two additional breaks daily, for a total of four breaks plus lunch because it "makes sense psychologically, because if they're timed out, you're getting a break about every two hours." (Id. at 14). Dr. Tracy stated that there is "pretty good literature in anxiety management that suggests anxiety levels . . . peak in about two hours. So . . . that time frame and that suggestion for two additional breaks, total of four over the course of the day, psychologically as a treatment made sense to me." (Id). Dr. Tracy opined that Ms. Schirnhofer being able to step away from her work any time she was experiencing a flooding event "would be helpful." (Id. at 17). Dr. Tracy also indicated, with respect to the additional breaks, that flexibility on the part of both PCS and Ms. Schirnhofer was important. (Id. at 18). Dr. Tracy opined: "I believe that a break every two hours in individuals is reasonable. More than that I think is probably not reasonable." (Id. at 19). When asked what literature supported his statement of a break every two hours, Dr. Tracy explained: "[t]his would be . . . what we generally teach," and "Albert Ellis would probably refer in his book to a two-hour time frame is when peak anxiety levels occur. And so a break every two hours would make sense." (Id.). Dr. Tracy concluded: "it's important to understand that that's average. You may go to work and not need any breaks at all for the entire day." (Id.). Dr. Tracy explained that the goal of a therapist would be to get Ms. Schirnhofer to the point that she did not need the two additional breaks. (Id. at 20-21). With respect to reducing the number of breaks Ms. Schirnhofer took from four breaks

to the two breaks which all PCS employees were entitled, Dr. Tracy explained "[i]n a perfect world, I would want Beth to have a dialogue with her work supervisor and that they cooperatively develop a plan that makes sense," with both her supervisor and Ms. Schirnhofer being flexible. (Id.).

With respect to what he meant when he stated that Ms. Schirnhofer had a decreased ability to communicate, Dr. Tracy explained: "conflict, when we define, psychologically, conflict, the definition is actually inability to communicate. So at the core, conflict arises because individuals can't get together, resolve problems. And so I think, you know, there was evidence there that [Ms. Schirnhofer] had a difficult time when a problem arose dealing with a resolution. . . . It's – so it's not so much that she couldn't communicate, probably the way in which she communicated." (ECF No. 70-1 at 43-44).

Dr. Tracy opined that the conflict Ms. Schirnhofer had with her co-workers, which caused flooding events, was a stress response and although he could not say for certain that the conflict was from PTSD, he believed that it was a reemergence of PTSD symptoms. (ECF No. 78-1 at 22). Dr. Tracy "hypothesize[d] that, because she had the PTSD, she was more likely to get into a conflict with her [co-]workers. [Although] I can't say that it's an absolute relationship." (Id. at 23). He explained, "a dispute with her co-workers . . . that is a difficulty in communicating." (ECF No. 70-1 at 49).

In response to the question "[b]ut even at the end of 2013 and into the beginning of 2014, Beth Schirnhofer was able to carry on with her normal, regular life activities," Dr. Tracy explained, "she compensated, yes." (ECF No. 70-1 at 48-49).

At the time Ms. Schirnhofer got into the argument with Ms. Gozner (on November 27, 2013), she was being given breaks by Ms. Gillooly as needed and generally was smoking during

these breaks. (ECF No. 78-1 at 22). Dr. Tracy stated that smoke breaks help; they reduce anxiety levels and are a very common way people deal with stress. (Id. at 24-25). Dr. Tracy also explained that he could not predict how Ms. Schirnhofer would respond to a flooding event if she did not have more than two smoke breaks a day. (Id. at 26). Dr. Tracy also stated that he did not know how Ms. Schirnhofer's ability to deal with her major life activities would have been affected had her desk moved away from the people who were causing her stress. (ECF No. 78-1 at 26).

## II. Standard of Review

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The parties must support their respective positions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1)(A). In other words, summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

In reviewing the evidence, the court draws all reasonable inferences in favor of the nonmoving party. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986); Huston v. Procter & Gamble Paper Prod. Corp., 568 F.3d 100, 104 (3d Cir. 2009) (citations omitted). It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. See Anderson, 477 U.S. at 255; Marino v. Indus. Crating Co.,

358 F.3d 241, 247 (3d Cir. 2004); <u>Boyle v. County of Allegheny</u>, 139 F.3d 386, 393 (3d Cir. 1998).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  <u>Anderson</u>, 477 U.S. at 247-48.  An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with regard to that issue.  <u>See id.</u>  "Where the record taken as a whole could not lead a reasonable trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  <u>Matsushita</u>, 475 U.S. at 587; <u>Huston</u>, 568 F.3d at 104.

**III. Discussion**

   **A.  Violation of Family and Medical Leave Act claims – Counts I and II of the FAC**

PCS argues that summary judgment must be granted with respect to Ms. Schirnhofer's claims of interference and retaliation in violation of the Family and Medical Leave Act.  Ms. Schirnhofer responds that she is no longer pursuing these claims. Accordingly, the court will grant PCS's motion for summary judgment on Ms. Schirnhofer's FMLA claims, found in counts I and II of the plaintiff's FAC.

   **B.  Violation of the Americans with Disabilities Act claims – Counts VI (disability discrimination), VII (failure to accommodate), and VIII (retaliation) of the FAC**

   1.  <u>Ms. Schirnhofer has adduced sufficient evidence from which a reasonable factfinder could conclude that she suffers from PTSD and anxiety</u>

PCS argues that summary judgment must be granted with respect to Ms. Schirnhofer's claims of disability discrimination, failure to accommodate, and retaliation in violation of the ADA because she has failed to produce sufficient evidence from which a reasonable fact finder could conclude that she suffers from an important limitation in any major life activity.  In support of this contention PCS argues that all of Ms. Schirnhofer's disability claims are based upon her being diagnosed with PTSD and anxiety by her medical providers and Dr. Tracy, her

expert, but their diagnoses may be disregarded because they suffer from serious methodological and procedural flaws and because Ms. Schirnhofer does not remember being diagnosed with PTSD.[6] PCS argues that "Tracy did no psychological testing of his own for PTSD because of Plaintiff's long history of PTSD treatment and relied on the mental health providers who he believed had diagnosed PTSD. Tracy, however, admitted that the mental health care providers also did not do any psychological testing to diagnose Plaintiff's alleged PTSD." (ECF No. 66 at 4) (citations to record excluded). PCS does not cite any authority, legal or otherwise, in support of this argument.

Dr. Tracy, an expert in the treatment of PTSD, opined in his expert report that "based on (1) all my knowledge and experience, including but not limited to that set forth above, (2) evidence described in the Opinions/Facts and Data discussions below, and (3) my review of the documents and authorities in Appendix 1, attached to this Report" . . . Schirnhofer "suffered from PTSD and other anxiety disorders." (ECF No. 58-1). With respect to "The Facts and Data Which Form the Basis of [his] Opinions," Dr. Tracy stated in his expert report:

> [b]y history, Ms. Schirnhofer describes a long history of PTSD related symptoms that first appeared in early adolescence [after a traumatic event]. Ms. Schirnhofer stated that she did not formally receive a PTSD diagnosis until her adult years but once that finally occurred she had an explanation for her mental health woes. She also described a [second traumatic event] that further exacerbated her PTSD symptoms. Ms. Schirnhofer reports involvement with counseling services episodically over a 30 year span that involved management of a mood disorder, anxiety and PTSD related behavior. She reports a typical wane and wane pattern of behavioral health symptoms consistent with chronic PTSD, Generalized Anxiety Disorder, and Major Depressive Disorder.

---

[6] Ms. Schirnhofer did not recall at her deposition ever being diagnosed as having PTSD, either earlier in her life or at or after 2010 when she began treating with Dr. Wayne, Dr. McElhose, and Mr. Brodkorb. (ECF No. 46 at 2, ¶ 10). Thereafter, she told Scott Tracy, Ph.D., the expert in her case, that she recalled being diagnosed with PTSD, and having a conversation with a therapist who provided her the PTSD diagnosis; presumably this was Dr. McElhose. (ECF No. 70-1 at 10-11).

(Id. at 5).  Dr. Tracy noted that a review of Ms. Schirnhofer's psychiatric records supported her historical report.

Dr. Tracy's deposition confirmed his diagnoses of PTSD and anxiety. (ECF No. 70-1 at 55).  Dr. Tracy also stated in his deposition that the diagnostic procedure he used, the biopsychosocial evaluation, is not only a validated standardized procedure, it is the gold standard.  (Id. at 76).

Dr. McElhose, Ms. Schirnhofer's past treating psychologist, diagnosed Ms. Schirnhofer with PTSD based upon the symptoms and history she reported to him. (ECF No. 58-2 at 9).  He also noted that there was no evidence that Ms. Schirnhofer was malingering. (Id. at 8).  Dr. Wayne, Ms. Schirnhofer's treating psychiatrist, testified that he had initially treated Ms. Schirnhofer as bi-polar, but changed his diagnosis to PTSD because of her symptoms and how she reacted to medication.  (ECF No. 58-6 at 4, 6, 9-11).  He described her PTSD to be "[c]hronic and significant and ongoing." (ECF No. 58-6 at 8).

While Dr. Tracy agreed that if Ms. Schirnhofer misrepresented her past history, then it would impact his opinion and absent corroboration of her past history, he could not know for certain if she has PTSD, neither Ms. Schirnhofer's treatment providers nor Dr. Tracy opined that Ms. Schirnhofer was misrepresenting either her past history or the symptoms from which she reported to suffer.  To the contrary, Dr. McElhose concluded that Ms. Schirnhofer was not malingering. Viewing the facts in a light most favorable to Ms. Schirnhofer as the nonmoving party, the court finds that Ms. Schirnhofer has adduced sufficient evidence from which a factfinder could reasonably conclude that Ms. Schirnhofer suffered from PTSD and anxiety prior to, and throughout, her employment with PCS.  Accordingly, PCS's argument is rejected.

      2.  <u>Ms. Schirnhofer has adduced sufficient evidence from which a reasonable</u>

<u>factfinder could conclude that she was "actually disabled."</u>

PCS asserts that judgment must be entered in its favor with respect to Ms. Schirnhofer's ADA disability discrimination claim (Count VI of the FAC) and her ADA failure to accommodate claim (Count VII of the FAC) because Ms. Schirnhofer failed to produce sufficient evidence from which a reasonable factfinder could conclude that her neck injury, PTSD,[7] or anxiety substantially limited her ability to perform a major life activity while she was employed at PCS and thus, that she was actually disabled under the ADA. Ms. Schirnhofer does not argue in any of her opposition briefs that a neck injury is relevant to her to ADA claims. Accordingly, the court finds that Ms. Schirnhofer has abandoned any claims based upon a neck injury and it is not necessary to address any of PCS's arguments with respect to a neck injury.

"Whether an individual is substantially limited in performing a major life activity is a question of fact. This means that—in deciding a motion for summary judgment—the court must decide whether the plaintiff has adduced sufficient evidence from which a jury reasonably could infer that the plaintiff was disabled. <u>Litzinger v. Allegheny Lutheran Soc. Ministries</u>, Civ. No. 15-306, 2017 WL 3089022, at *5 (W.D. Pa. July 20, 2017).

On January 1, 2009, the ADA Amendments Act of 2008 ("ADAAA"), Pub. L. 110–325, 122 Stat. 3553, became effective. The ADAAA seeks to broaden the scope of disabilities covered by the ADA. Under the ADAAA, "disability" is defined as "(A) a physical or mental impairment that substantially limits one or more major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). "These three prongs are distinct, and a plaintiff can proceed under one or all three." <u>Litzinger</u>, 2017 WL 3089022, at *5.

---

[7] For purposes of this argument only, PCS assumed that Ms. Schirnhofer had PTSD (ECF No. 47 at 18).

Equal Employment Opportunity Commission ("EEOC") regulations provide guidance for interpreting the amended statute. According to the regulations, "[a]n impairment is a disability" when it "substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). "The term '[s]ubstantially limits' shall be construed broadly in favor of expensive coverage" and "is not meant to be a demanding standard." Id. at § 1630.2(j)(1)(i). "An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section." Id. at § 1630.2(j)(1)(ii). "An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 29 C.F.R. § 1630.2 (j)(1)(vii). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working." Id. at § 1630.2(i)(1). "The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis." Id. at § 1630.2(j)(1)(iii).

With respect to PTSD, the EEOC regulations provide:

The individualized assessment of some types of impairments [including PTSD] will, in virtually all cases, result in a determination of coverage under . . . the "actual disability" prong . . . or . . the "record of" prong[] of this section. Given their inherent nature, these types of impairments will, as a factual matter, virtually always be found to impose a substantial limitation on a major life activity. Therefore, with respect to these types of impairments, the necessary

individualized assessment should be particularly simple and straightforward
. . .

For example, applying the principles set forth in paragraphs (j)(1)(i) through (ix) of this section, it should easily be concluded that the following types of impairments will, at a minimum, substantially limit the major life activities indicated: . . . post-traumatic stress disorder . . . substantially limit[s] brain function.

Id. at § 1630.2(j)(3)(iii).

PCS focuses its not "actually disabled" argument on Ms. Schirnhofer's ability to communicate. It argues that the evidence of record supports that Ms. Schirnhofer could communicate effectively with her children, fiancée, treating medical professionals, Dr. Tracy, her PCS supervisor and co-workers, and other employers both before and after she stopped working at PCS and therefore, she was not substantially limited in her ability to communicate. PCS contends that the record supports that Ms. Schirnhofer received annual merit raises and excellent performance evaluations, was able to communicate well enough to do her job well, and that any communication that was necessary for her to do her job, she was able to do. PCS emphasizes that Ms. Schirnhofer worked for a number of employers before and after she was employed by PCS and has not asked any other employer, before or after she worked at PCS, for an accommodation.

Ms. Schirnhofer responds that she has raised a genuine issue of material fact as to whether, her PTSD has substantially limited the major life activities of brain function, communication, interaction with others, and thinking. In support, Ms. Schirnhofer cites to: (1) the PTSD diagnoses and opinions regarding Ms. Schirnhofer by treating her mental health providers, Dr. Wayne and Dr. McElhose, and Dr. Tracy; (2) her increased conflicts with her co-workers; and (3) numerous statements made about her by Ms. Gillooly, Mr. Schmac, and Ms. Schmac that show she was having significant difficulty communicating and interacting with

others at PCS.

Viewing the facts of record in a light most favorable to Ms. Schirnhofer as the nonmoving party, the court finds that Ms. Schirnhofer has presented sufficient evidence from which a reasonable factfinder could conclude that beginning in 2013 and continuing until she was terminated in February 2014, Ms. Schirnhofer was substantially limited in the major life activities of communicating and/or interacting with others[8] as compared to most people in the general population as a result of her suffering from PTSD and anxiety. Ms. Schmac testified at her deposition that Ms. Schirnhofer "complained about everything. She complained about [co-workers] talking. . . . [J]ust the fact that if she could hear their voice, she complained about." (ECF 58-26 at 8). She even complained about a co-worker who had talked about holding a baby. (ECF 58-17 at 4-5). Ms. Schmac described Ms. Schirnhofer's behavior as "beyond sensitive" and not what a normal person would do. (Id.). Ms. Gillooly stated that it was hard to review Ms. Schirnhofer for her work in 2013 because her personal issues had started to overshadow the good job she did, especially when it affected others in the billing department. (ECF No. 58-18 at 3). Ms. Gillooly also discussed how Ms. Schirnhofer complained about her co-workers whispering about her and ultimately, those co-workers stated that they had whispered because they did not want to upset Ms. Schirnhofer. (ECF No. 58-22 at 2). Mr. Schmac noted that Ms. Schirnhofer needed to improve her communication with others in the office and that Ms. Schirnhofer had relationship issues with her co-workers. (ECF No. 58-18 at 2). Mr. Brodkorb opined, and Dr. Wayne agreed, that Ms. Schirnhofer was limited in her ability to communicate with her co-workers and supervisor at times. Schirnhofer's PTSD and anxiety "caused her to have a

---

[8]     In light of this finding, it is not necessary for the court to address whether Ms. Schirnhofer has presented sufficient evidence from which a reasonable factfinder could conclude that beginning in 2013 and continuing until she was terminated in February 2014, she was substantially limited in the major life activity of communicating or brain function (thinking).

significantly decreased ability to interact effectively and communicate in the workplace as compared to the average person." (ECF No. 58-1 at 5) and he equated Ms. Schirnhofer's conflicts with her co-workers as being an inability to communicate; "that is a difficulty in communicating (ECF No. 70-1 at 49). Therefore, the court concludes, a reasonable jury could conclude that Ms. Schirnhofer was "actually disabled" under the ADA.

In so holding, the court notes that the case upon which PCS relies for establishing why the court should not conclude Ms. Schirnhofer is substantially limited in her ability to communicate, Bennett v. Unisys Corp., Civ. No. 99-446, 2000 WL 33126583 (E.D. Pa. Dec. 8, 2000), supports Ms. Schirnhofer's case when the facts of record are viewed in the light most favorable to Ms. Schirnhofer. In Bennett, the court found, based upon the plaintiff's conduct, which was strikingly similar to Ms. Schirnhofer's actions in this matter, that the plaintiff had put forth sufficient evidence to survive summary judgment with respect to her ADA failure to accommodate claim which was based, in relevant part, upon the plaintiff being substantially limited in the activity of interacting with others: "[s]he was belligerent and displayed an unprofessional attitude. She had difficulty controlling her emotions, and had, as she characterizes it, 'paranoia'. She was incredibly sensitive to criticism. Carol Sorrick, Bennett's manager, testified that Bennett's peers did not feel that they could approach her and have a meaningful conversation with her. Bennett's poor interpersonal skills were listed as the reason she was terminated." Bennett, 2000 WL 33126583, at *6 (citations to record and footnotes omitted). The Bennett court concluded, as does this court with respect to Ms. Schirnhofer, that "[t]he fact that a person is blunt in his or her interpersonal dealings and has poor judgment does not give them a cause of action under the ADA. [The plaintiff] is allowed to proceed because she put forth evidence linking her behavior to symptoms of her mental disability." Id. Accordingly,

PCS's argument is rejected.

### 3. Ms. Schirnhofer has adduced sufficient evidence from which a reasonable factfinder could conclude that she was "regarded as" disabled by PCS

PCS asserts that judgment must be entered in its favor as to Ms. Schirnhofer's ADA disability discrimination claim (Count VI of her FAC) because she has failed to demonstrate that PCS regarded her as disabled. "An individual is 'regarded as disabled' if he is 'subjected to a prohibited action because of an actual or perceived physical or mental impairment, whether or not that impairment substantially limits, or is perceived to substantially limit, a major life activity.' A 'regarded as disabled' claim 'focuses not on [Plaintiff] and [her] actual abilities, but rather on the reactions and perceptions of the persons interacting or working with [her]." Yanoski v. Silgan White Cap Americas, LLC, 179 F. Supp.3d 413, 428 (M.D. Pa. 2016) (quoting 29 C.F.R. § 1630.2(l); Kelly v. Drexel University, 94 F.3d 102, 108–09 (3d Cir. 1996)). "Because the ADA 'requires the court to determine whether the plaintiff was "subjected to an action prohibited" by the ADA "because of an actual or perceived impairment," most courts have concluded that causation is an integral part of the threshold finding that a plaintiff is regarded as having a disability." Tirk v. Dubrook, Inc., Civ. No. 14-889, 2016 WL 427738, at *4 (W.D. Pa. Feb. 4, 2016) (citing Baughman v. Cheung Enters, LLC, No. 13-1511, 2014 WL 4437545, at *12 (M.D. Pa. Sep. 9, 2014)). "The weight of temporal evidence is context-specific and 'must be considered with a careful eye to the specific facts and circumstances encountered." Proudfoot v. Arnold Logistics, LLC., 59 F.Supp.3d 697, 708 (M.D. Pa. 2014) (quoting Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000)). Temporal proximity is measured between the time the employer learned of the alleged "disability" and when the adverse employment action occurred. Warshaw v. Concentra Health Services, 719 F.Supp.2d 484, 496 (E.D. Pa. 2014). "Courts that have relied on a temporal link to overcome summary judgment have typically

required an extremely short time period or the existence of additional circumstantial facts to support causation." Tirk, 2016 WL 427738, at *4 (citations omitted).

PCS argues that Ms. Schirnhofer cannot establish that it regarded her as disabled because the evidence of record shows that PCS gave Ms. Schirnhofer excellent performance reviews and annual salary increases, consistently found her work to exceed expectations, and even when PCS denied Ms. Schirnhofer's request for the two additional breaks she contended was necessary to accommodate her PTSD and anxiety, PCS offered to transfer her to another open position at PCS.

Ms. Schirnhofer responds by contending that she has adduced sufficient evidence that PCS regarded her as disabled. She references the disclosure of her PTSD and anxiety and her request for accommodation to Ms. Schmac and Ms. Snyder on January 15, 2014 by way of the Accommodation Form.[9] She cites to Ms. Snyder informing Ms. Schmac that PTSD is considered a disability and Ms. Snyder's subsequent recommendation that PCS accommodate Ms. Schirnhofer by providing the requested additional breaks. Ms. Schirnhofer references the numerous comments Ms. Schmac made about Ms. Schirnhofer's behavior, including that her complaints about co-workers were "beyond sensitive," that she was not acting like a "normal person," that "if it bothers Beth (that a co-worker was talking about holding a baby), she is going to have to seek medical attention for her issue," and that Ms. Schirnhofer "truly is Cybill (sic)." (ECF Nos. 58-17 at 4-5; 58-22 at 2; 58-26 at 8). Ms. Schirnhofer also cites to the temporal proximity between her accommodation request on January 15, 2014 and her termination by Ms. Schmac on February 5, 2014.

---

[9]     "[T]he mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that that perception caused the adverse employment action." Kelly v. Drexel Univ., 94 F.3d 102, 109 (3d Cir. 1996) (citation omitted). See also Litzinger, 2017 WL 3089022, at *7 (same).

PCS learned that Ms. Schirnhofer suffered from an anxiety disorder on December 9, 2013, when Ms. Schirnhofer gave Ms. Gillooly the December 9 letter from Mr. Brodkorb requesting Ms. Schirnhofer be able to take two additional breaks per day because of an anxiety disorder.  On January 14, 2014, Ms. Schmac stated in an email to Mr. Schmac and Ms. Snyder that her complaints about co-workers were "beyond sensitive," that she was not acting like a "normal person," and that "if it bothers Beth (that a co-worker was talking about holding a baby), she is going to have to seek medical attention for her issue." (ECF Nos. 58-17 at 4-5; 58-26 at 8). PCS learned that Ms. Schirnhofer suffered from PTSD and anxiety on January 15, 2014, when it received the Accommodation Forms signed by Mr. Brodkorb and Dr. Wayne. Thereafter, on February 5, 2014: (1) Ms. Schirnhofer told Ms. Gillooly that a co-worker was referring the Ms. Schirnhofer as Sybil, the movie character who suffered from multiple personalities; (2) Ms. Gillooly e-mailed Mr. Schmac about the Sybil comment; (3) Mr. Schmac forwarded Ms. Gillooly's email to Ms. Schmac; and (4) Ms. Schmac responded to Mr. Schmac's email, stating "I think you need to let Beth go as she truly is Cybill (sic.)." (ECF No. 58-22 at 2).  Viewing this evidence in a light most favorable to Ms. Schirnhofer as the nonmoving party, a reasonable fact finder could conclude that PCS regarded Ms. Schirnhofer as disabled.  Accordingly, PCS's argument is rejected.

4.  <u>PCS has not established that it is entitled to summary judgment as a matter law as to Ms. Schirnhofer's ADA failure to accommodate claim</u>

"To state a claim of disability discrimination under the ADA, the plaintiff must demonstrate that she (1) has a disability; (2) is a qualified individual, i.e., can perform the essential functions of the job, with or without accommodation, and (3) has suffered an adverse employment action because of her disability." <u>Subasic v. Sharon Regional Health Systems</u>, 2016 WL 861122, at *1 (W.D. Pa. March 7, 2016) (citing <u>Turner v. Hershey Chocolate U.S.</u>, 440 F.3d

604, 611 (3d Cir. 2006) (citing <u>Buskirk v. Apollo Metals</u>, 307 F.3d 160, 166 (3d Cir. 2002));

<u>Gaul v. Lucent Techs. Inc.</u>, 134 F.3d 576, 580 (3d Cir. 1998)). "The refusal to make reasonable

accommodations for a plaintiff's disabilities constitutes an adverse employment decision."

<u>Zombeck v. Friendship Ridge</u>, Civ. No. 08-1626, 2011 WL 666200, at *5 (W.D. Pa. Feb. 14,

2011) (citing <u>Williams v. Phila. Hous. Auth. Police Dep't</u>, 380 F.3d 751, 761 (3d Cir. 2004)

("[a]dverse employment decisions in this context include refusing to make reasonable

accommodations for a plaintiff's disabilities.").

PCS contends that based upon Dr. Tracy's statements in his deposition, there is no

genuine issue of material fact as to whether the accommodation Ms. Schirnhofer sought was

reasonable and therefore, she is not a "qualified individual" under the ADA and it is entitled to

summary judgment on her ADA reasonable accommodation claim as a matter of law. "[T]he

issue of 'reasonable accommodation' presents a fact question. In deciding whether a genuine

issue of material fact exists regarding the reasonableness of the requested accommodation, we

first examine whether [the plaintiff] has made a facial showing that her proposed accommodation

is possible. If [the plaintiff] has made out a prima facie showing, the burden then shifts to [the

defendant] to prove, as an affirmative defense, that the accommodations requested by [the

plaintiff] are unreasonable, or would cause an undue hardship on the employer." <u>Turner v.

Hershey Chocolate U.S.</u>, 440 F.3d at 614 (citations omitted). A "reasonable accommodation"

includes measures such as "job restructuring, part-time or modified work schedules,

reassignment to a vacant position, acquisition or modification of equipment or devices, ... and

other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9).

PCS's argument is based upon Dr. Tracy's deposition testimony with respect to "Opinion

Four" set forth in his expert report. Dr. Tracy's "Opinion Four" stated: "[d]ue to her PTSD and

anxiety, Beth Schirnhofer needed to be able to step away from the stressor or trigger, and to decompress, in order to restore her composure and concentration and be able to work. The workplace accommodation of two additional breaks per day, as needed, that was requested of PCS was appropriate and warranted given Beth Schirnhofer's PTSD and flooding symptoms." (ECF No. 58-1 at 5). PCS claims that based upon Dr. Tracy's statements at his deposition, 1) PCS was already providing a break policy that was consistent with what Dr. Tracy recommended was needed to accommodate Ms. Schirnhofer's PTSD, 2) the two additional breaks requested by Ms. Schirnhofer were not reasonable and were indicative of an employee who is unable to do her job, and 3) the accommodation which PCS offered to Ms. Schirnhofer, moving her workspace away from two of her co-workers who were disrupting her concentration, was a reasonable accommodation which Ms. Schirnhofer refused.

During his deposition, Dr. Tracy explained that he agreed that Ms. Schirnhofer should be given two additional breaks daily, for a total of four breaks, plus lunch, because it "makes sense psychologically, because if they're timed out, you're getting a break about every two hours." (ECF No. 78-1 at 14). Dr. Tracy further explained that there is "pretty good literature in anxiety management that suggests anxiety levels, you know, peak in about two hours. So those -- you know, that time frame and that suggestion for two additional breaks, total of four over the course of the day, psychologically as a treatment made sense to me." (ECF No. 78-1 at 14). Dr. Tracy also stated that Ms. Schirnhofer being able to step away from her work any time she was experiencing a flooding event "would be helpful" and that with respect to the additional breaks, that flexibility on the part of PCS and on the part of Ms. Schirnhofer was important. (ECF No. 78-1 at 17-18). Dr. Tracy opined: "I believe that a break every two hours in individuals is reasonable. More than that I think is probably not reasonable." (ECF No. 78-1 at 19). When

asked what literature supported his statement of a break every two hours, Dr. Tracy explained: "[t]his would be . . . what we generally teach," and "Albert Ellis would probably refer in his book to a two-hour time frame is when peak anxiety levels occur. And so a break every two hours would make sense." (ECF 78-1 at 19). Dr. Tracy also explained: "it's important to understand that that's average. You may go to work and not need any breaks at all for the entire day." (ECF No. 78-1 at 19). Dr. Tracy was never provided with Ms. Schirnhofer's actual work schedule and questioned as to whether he opined based upon her actual hours of work, two additional breaks was a reasonable accommodation.

PCS 's Work Hours Policy required non-exempt employees like Ms. Schirnhofer to work Monday-Friday from 8:30 a.m. to 5:00 p.m. and allowed a ten-minute break in the morning and in the afternoon as well as a thirty-minute lunch period any time between 11:30 a.m. and 2:00 p.m., as well as restroom and coffee breaks as needed, already provided Ms. Schirnhofer with a break every two hours. PCS contends that consistent with Dr. Tracy's conclusion that taking a break approximately every two hours was warranted and reasonable, Ms. Schirnhofer started her workday at PCS at 8:30 a.m., she could take her morning break after two hours, from 10:30 a.m. to 10:40 a.m., take her lunch period from 12:40 p.m. to 1:10 p.m., take her afternoon break two hours after she returned from lunch, from 3:10 p.m. to 3:20 p.m., and then leave work at 5:00 p.m., less than two hours after she returned to work from her afternoon break. Therefore, PCS argues, it was already providing Ms. Schirnhofer with all the breaks needed to accommodate her disability and it was not required to give Ms. Schirnhofer the two additional breaks because to do so would be unreasonable.

Viewing the facts of record in a light most favorable to Ms. Schirnhofer, a reasonable fact finder could interpret the application of Dr. Tracy's "break about every two hours" testimony

differently that contended by PCS.  Based upon Ms. Schirnhofer's start time of 8:30 a.m., a fact

finder could interpret Dr. Tracey's testimony as requiring PCS to give Ms. Schirnhofer a 10-

minute break at approximately 10:30 a.m., 12:30 p.m., 2:30 p.m. and 4:30 p.m. for a total of four

breaks daily, in addition to her lunch period which according to PCS's Work Hours Policy was

to be taken between 11:30 a.m. and 2:00 p.m., and thus, would not necessarily encompass the

12:30 p.m. 10-minute break.  Accordingly, PCS is not entitled to summary judgment on Ms.

Schirnhofer's ADA failure to accommodate claim on the basis that it was already providing a

break policy that was consistent with what Dr. Tracy recommended was needed to accommodate

Ms. Schirnhofer's PTSD or that the two additional breaks requested by Ms. Schirnhofer were not

reasonable and were indicative of an employee who is unable to do her job.

The court also does not agree with PCS's assertion that summary judgment should be

granted in its favor on Ms. Schirnhofer's ADA failure to accommodate claim because: (1) Dr.

Tracy testified that moving Ms. Schirnhofer's desk away from the co-workers whom Ms.

Schirnhofer contended were the source of her work stressors was a reasonable accommodation;

(2) PCS had made such an offer to Ms. Schirnhofer; and (3) Ms. Schirnhofer rejected its offer of

this reasonable accommodation.  29 C.F.R. § 1630.9 provides:

> (d) An individual with a disability is not required to accept an accommodation, aid, service, opportunity or benefit which such qualified individual chooses not to accept. However, if such individual rejects a reasonable accommodation, aid, service, opportunity or benefit that is necessary to enable the individual to perform the essential functions of the position held or desired, and cannot, as a result of that rejection, perform the essential functions of the position, the individual will not be considered qualified.

29 C.F.R. § 1630.9(d).  See Yovtcheva v. City of Philadelphia Water Dep't, 518 F. App'x 116,

121 (3d Cir. 2013) (an employee is not a "qualified individual" entitled to protection under the

ADA if she refuses to try a reasonable accommodation and as a result of the refusal, cannot

perform the essential functions of the position held).

On January 9, 2014, in response to Ms. Schirnhofer complaining to Ms. Gillooly that two of her co-workers (one was Ms. Gozner) were talking and disrupting her concentration, Ms. Gillooly offered that Ms. Schirnhofer could move her workspace. (ECF Nos. 48-18 at 1; 70-8 at 1-2). At his deposition, Dr. Tracy was asked questions about the argument between Ms. Schirnhofer and Ms. Gozner on November 27, 2013, that led to both women being disciplined:

> Q: So all you know is you have two coworkers having a large argument?
> A: Right.
> Q. Do you know in terms of walking away, would it have been something that she might have accepted to deescalate things to move her desk to another location away from the people that she was arguing with?
> A; Well, as a general treatment rule, yes. I mean --
> Q: yes.
> A: -- so moving your physical location is something that is helpful.
> Q. Were you aware that she was offered that, that she was offered to move her location to a –
> A: I recall seeing references about movement, yes.
> Q. And she didn't choose to do that?
> A: Correct.
> Q: And do you believe that that was a result of her inability to resolve conflict?
> A: Yes.

(ECF No. 70-1 at 42-43). Dr. Tracy also stated later in his deposition that he did not know how Ms. Schirnhofer's ability to deal with her major life's activities would have been affected had she not gotten two smoke breaks but instead, had her desk moved away from the people who were causing her stress by talking, *i.e.* he did not know if moving Ms. Schirnhofer's desk would be an effective accommodation. (ECF No. 78-1 at 26).

Viewing the facts of record in a light most favorable to Ms. Schirnhofer as the non-moving party, contrary to PCS's assertion, it is not clear from Dr. Tracy's testimony that Ms. Schirnhofer rejected an offer of a reasonable accommodation when she refused the offer to move

her workspace away from Ms. Gozner and the other co-worker whose talking was interfering with Ms. Schirnhofer's concentration. Accordingly, PCS's argument is rejected.

> 5. <u>Ms. Schirnhofer has adduced sufficient evidence from which a reasonable factfinder could conclude that she had a reasonable, good faith belief that she needed the accommodation she requested</u>

"In order to establish a *prima facie* case of retaliation, employees must show that their employer took adverse action against them for engaging in a protected activity. <u>Jackson v. J. Lewis Crozer Library</u>, 445 F. App'x 533, 536 (3d Cir. 2011). Requesting an accommodation on account of one's disability is a protected activity. <u>Jackson</u>, 445 F. App'x. at 536 (citing <u>Sulima v. Tobyhanna Army Depot</u>, 602 F.3d 177, 188 (3d Cir. 2010)).

A plaintiff need not establish that she is a "qualified individual with a disability" to establish a claim of retaliation under the ADA. <u>Krouse v. American Sterilizer Co.</u>, 126 F.3d 494, 502 (3d Cir. 1997) (emphasis in original). She must, however, "show that she had a reasonable, good faith belief that she was entitled to request the reasonable accommodation she requested." <u>Williams v. Philadelphia Hous. Auth. Police Dep't</u>, 380 F.3d 751, 759 (3d Cir. 2004). "The requirement of a good faith request for an accommodation means that the protection from retaliation afforded under the ADA does not extend to an employee whose request is motivated by something other than a good faith belief that he/she needs an accommodation." <u>Shellenberger v. Summit Bancorp, Inc.</u>, 318 F.3d 183, 191 (3d Cir. 2003).

PCS asserts that judgment must be entered in its favor with respect to Ms. Schirnhofer's ADA retaliation claim because, based upon the evidence of record, she cannot establish that she had a reasonable, good faith belief that she was entitled to request the accommodation of two additional breaks. PCS contends that the only reason Ms. Schirnhofer requested the additional breaks on December 9, 2013 was because three days earlier she had received the FOD for

arguing with Ms. Gozner on November 27, 2013, she was worried about the status of her employment, and thus, came up with the excuse that she needed extra breaks to accommodate her anxiety disorder. In support of its argument, PCS contends that Ms. Schirnhofer claimed to had had PTSD and anxiety for many years and yet, prior to the time when she became concerned about losing her job, Ms. Schirnhofer had excellent performance reviews, was able to do her job without an accommodation, and she never asked PCS for an accommodation. PCS also notes that since Ms. Schirnhofer was terminated by PCS, she has worked for a number of employers and has not asked for an accommodation. Finally, PCS argues that Mr. Brodkorb's treatment notes establish that Ms. Schirnhofer did not believe that she needed the accommodation of the two additional breaks for her alleged disabilities because Ms. Schirnhofer opined to Mr. Brodkorb that she needed an accommodation because the stress from her job was changing her personality.

While PSC contends that the request for an accommodation was a ploy by Ms. Schirnhofer to save her job, to hold as a matter of law that Ms. Schirnhofer lacked a reasonable, good faith belief that she was entitled to request the additional breaks on that basis would require a credibility determination that the court cannot make at this stage in the proceedings. Viewing the evidence of record in a light most favorable to Ms. Schirnhofer as to nonmoving party, and not making any credibility determinations, the court finds that a reasonable fact finder could conclude that Ms. Schirnhofer had a reasonable, good faith belief that she was entitled to request the two additional breaks. Prior to December 6, 2013, when Ms. Schirnhofer was feeling stressed or otherwise had flooding symptoms while performing her job as a billing assistant for PCS, Ms. Gillooly had allowed her to take breaks in excess of the two breaks permitted under PCS Work Hours Policy. (ECF No. 58-28 at 5). As of December 6, 2013, however, Ms. Snyder explained to Ms. Schirnhofer that she was not permitted to take any additional breaks unless and

until she had a formal request for an accommodation. (ECF Nos. 48-12 at 3; 58-11 at 2). Therefore, Ms. Schirnhofer talked with her therapist, Mr. Brodkorb, and he agreed that Ms. Schirnhofer needed to be able to take short breaks during her work day to assist with her coping with work stressors that resulted from her PTSD and anxiety symptoms and drafted paperwork that made such a request. (ECF No. 58-13 at 2). Dr. Wayne also signed off on the request. (ECF No. 48-5 at 14). Thereafter, when Ms. Snyder stated that PCS needed more information, Mr. Brodkorb completed, and Dr. Wayne signed off on PCS's Accommodation Form, wherein they requested that Ms. Schirnhofer's work schedule by adjusted to allow her to have an additional 10-minute break in the morning and an additional 10-minute break in the afternoon so that Ms. Schirnhofer would be able to compose herself and communicate with her co-workers and supervisor. (ECF No. 56-16 at 4, 7). Under these facts, Ms. Schirnhofer had a reasonable good faith belief that she was entitled to request the accommodation of the additional two breaks. The court further concludes that contrary to PCS's contention, Ms. Schirnhofer's lay opinion that the stressors of her job were affecting her personality was not incompatible with Mr. Brodkorb's medical description of her limitation being an inability to communicate with her co-workers and supervisors at times. Also to the extent PCS's arguments rest on the fact that Ms. Schirnhofer had never requested an accommodation from any other employer, absent proof that the work stressors were the same at those jobs as they were at PCS, that Ms. Schirnhofer had never requested an accommodation for any other employer is not probative on the issue of whether Ms. Schirnhofer had, or lacked, a reasonable good faith belief that she was entitled to request the additional breaks.

Accordingly, for all these reasons, PCS's motion for summary judgment on Ms. Schirnhofer's ADA claims shall be denied.

### C. Violation of the Pennsylvania Human Relations Act claims (Counts III, IV, and V of the FAC) and the Allegheny County Antidiscrimination Ordinance claim (Count IX of the FAC)

#### 1. Ms. Schirnhofer's PHRA and ACHRA disability discrimination and failure to accommodate claims

PCS contends that judgment must be granted in its favor with respect to Ms. Schirnhofer's PHRA and ACHRA disability discrimination and failure to accommodate claims. It argues that because Ms. Schirnhofer failed to adduce sufficient evidence from which a reasonable jury could conclude she was actually disabled or that PCS regarded her as disabled under the ADA, which has a more relaxed standard for establishing disability, Ms. Schirnhofer cannot establish that she is actually disabled or that PCS regarded her as disabled under the PHRA or ACHRA's more demanding tests for establishing disability.

For the reasons stated *supra.*, the court has concluded that Ms. Schirnhofer has presented sufficient evidence from which a reasonable jury could conclude either that she was actually disabled or that PCS regarded her as disabled under the ADA. Accordingly, PCS's motion for summary judgment on Ms. Schirnhofer's PHRA and ACHRA discrimination and failure to accommodate claims shall be denied.

#### 2. Ms. Schirnhofer's PHRA and ACHRA retaliation claims

PCS asserts that judgment must be granted in its favor with respect to Ms. Schirnhofer's PHRA and ACHRA retaliation claims for the same reason judgment should be granted in its favor with respect to its ADA retaliation claim, i.e., that Ms. Schirnhofer cannot establish that she had a reasonable, good faith belief that she was entitled to request the reasonable accommodation she requested.

Having concluded that PCS's motion for summary judgment on Ms. Schirnhofer's ADA retaliation claim must be denied because a reasonable fact finder could conclude that Ms.

Schirnhofer had a reasonable, good faith belief that she was entitled to request the reasonable accommodation she requested, the court shall also deny its motion for summary judgment as to Ms. Schirnhofer's PHRA and ACHRA retaliation claims.

**IV. Conclusion**

For the reasons stated above, Defendant PCS's motion for summary judgment will be granted as to Ms. Schirnhofer's Family Medical Leave Act claims, found in counts I and II of the plaintiff's FAC, and otherwise denied. An appropriate order follows.


Dated: March 28, 2018

BY THE COURT:

s/Cynthia Reed Eddy
Cynthia Reed Eddy
United States Magistrate Judge

cc:      all counsel of record via CM/ECF electronic filing